FILED
APR 27 2015
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

STEVEN E. LEITZ, Individually and on behalf of all others similarly situated

Plaintiff,

v.

KRAFT FOODS GROUP, INC., JOHN T. CAHILL, W. ANTHONY VERNON, ABELARDO BRU, L. KEVIN COX, MYRA M. HART, PETER B. HENRY, JEANNE P. JACKSON, TERRY J. LUNDGREN, MACKEY J. MCDONALD, JOHN C. POPE, E. FOLLIN SMITH, H.J. HEINZ HOLDING CORP., KITE MERGER SUB CORP., and KITE MERGER SUB LLC,

Defendants.

**Civil Action No.:** 3:15CV262

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

## SUMMARY OF THE ACTION

1. This is a stockholder class action brought by Plaintiff on behalf of the stockholders of Kraft Foods Group, Inc. ("Kraft" or "Company") against Kraft, the board of directors of Kraft ("Board" or "Individual Defendants"), H.J. Heinz Holding Corporation ("Heinz"), Kite Merger Sub Corp. ("Merger Sub 1"), and Kite Merger Sub LLC ("Merger Sub 2") to enjoin the sale of the Company (the "Proposed Transaction") to Heinz, Merger Sub 1, and Merger Sub 2 as detailed herein.

2.     On March 25, 2015, Kraft announced that it had entered into a definitive agreement with Heinz ("Merger Agreement") under which Heinz, through Merger Sub 1 and Merger Sub 2, would acquire all of the outstanding shares of Kraft. Under the terms of the Merger Agreement, Kraft stockholders will receive a $16.50 special dividend and as well as stock in the combined company representing a 49% stake in the new company, The Kraft Heinz Company ("Kraft Heinz"). Existing Heinz stockholders will collectively own 51% of Kraft Heinz. Pursuant to the Proposed Transaction, Berkshire Hathaway and 3G Capital will invest an additional $10 billion in Kraft Heinz. Based on Kraft's market capitalization following the announcement of the Proposed Transaction, investors pegged its value at approximately $49 billion. It is expected that the Proposed Transaction will close in the second half of 2015.

3.     Moreover, the terms of the Proposed Transaction were designed to ensure a transaction with Heinz on terms preferential to Heinz, and to subvert the interests of Plaintiff and the other public stockholders of Kraft. Preclusive deal protection devices in the Merger Agreement include, *inter alia*, (a) a "no-shop" provision which prohibits the Company from, among other things, soliciting or negotiating any alternative proposals; (b) a "matching rights" provision which grants Heinz the right to revise its proposal in response to a superior alternative proposal; (c) an "information rights" provision that entitles Heinz to receive a copy of any alternative proposal as well as the material terms thereof; and (d) a "termination fee" provision that requires the Company to pay a termination fee in connection with the Merger Agreement equal to $1.2 billion if the Proposed Transaction is terminated under certain circumstances. These provisions substantially and improperly limit the Board's ability to act with respect to investigating and pursuing superior proposals. These unreasonable deal protection devices preclude other bidders from making a successful competing offer for the Company.

4.     On April 10, 2015, Heinz filed a Form S-4 Registration Statement ("Registration Statement") with the U.S. Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction in order to solicit the Company's shareholder's votes in support of the Proposed Transaction. The Registration Statement fails to disclose material information to the shareholders of the Company so that the shareholders may make an informed decision regarding the Proposed Transaction, such that defendants violated Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Registration Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process for the Company; (b) management's financial projections; and (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinion provided by the Company's financial advisor, Centerview Partners LLC ("Centerview").

5.     These omissions and misstatements are a violation of Section 14 of the Exchange Act. As set forth in detail below, without the material information, Kraft's stockholders cannot make an informed decision as to whether or not they should vote in favor of the Proposed Transaction.

6.     To remedy Defendant's misconduct, Plaintiff seeks, among other things, injunctive relief preventing consummation of the Proposed Transaction unless and until the Company discloses all material information concerning the Proposed Transaction to Kraft's stockholders.

7.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from Defendants' violations of law.

**PARTIES**

8. Plaintiff is, and at all relevant times was, a continuous stockholder of Kraft.

9. Kraft is a Virginia corporation with its principal executive offices located at Three Lakes Drive, Northfield, Illinois 60093.

10. Defendant John T. Cahill is the Chairman of the Board and the Chief Executive Officer of Kraft and has served as a director of the Company since October 2012.

11. Defendant W. Anthony Vernon has served as a director of the Company since October 2012.

12. Defendant Abelardo Bru has served as a director of the Company since October 2012.

13. Defendant L. Kevin Cox has served as a director of the Company since October 2012.

14. Defendant Myra M. Hart has served as a director of the Company since October 2012.

15. Defendant Peter B. Henry has served as a director of the Company since October 2012.

16. Defendant Jeanne P. Jackson has served as a director of the Company since October 2012.

17. Defendant Terry J. Lundgren has served as a director of the Company since October 2012.

18. Defendant Mackey J. McDonald has served as a director of the Company since October 2012.

19.     Defendant John C. Pope has served as a director of the Company since August 2012.

20.     Defendant E. Follin Smith has served as a director of the Company since October 2012.

21.     Defendants Cahill, Vernon, Bru, Cox, Hart, Henry, Jackson, Lundgren, McDonald, Pope, and Smith are collectively referred to herein as the "Board" or the "Individual Defendants."

22.     Defendant Heinz is a Delaware corporation with its principal executive offices located at One PPG Place, Pittsburgh, Pennsylvania 15222.

23.     Defendant Merger Sub 1 is a Virginia corporation and a wholly-owned subsidiary of Heinz.

24.     Defendant Merger Sub 2 is a Delaware limited liability company and a wholly-owned subsidiary of Heinz.

25.     Collectively, Kraft, Heinz, the Individual Defendants, Merger Sub 1, and Merger Sub 2 are referred to herein as the "Defendants."

## JURISDICTION AND VENUE

26.     Jurisdiction is founded upon federal question jurisdiction, pursuant to § 27 of the Exchange Act, as amended, 15 U.S.C. § 78aa, and 28 U.S.C. § 1332.

27.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Kraft maintains offices in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District. Moreover, each of the Individual Defendants as Company officers and/or directors has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

28. Plaintiff brings this action on his own behalf and as a class action pursuant to Rule 23 on behalf of all holders of Kraft shares who are being and will be harmed by Defendants' actions described below ("Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of the Defendants.

29. This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. The Company's most recent Form 10-Q indicates that, as of October 25, 2014, there were 588,823,771 common shares of Kraft issued and outstanding. The actual number of stockholders of Kraft will be ascertained through discovery.

b. There are questions of law and fact that are common to the Class, including:

   i) whether Defendants misrepresented and omitted material facts in connection with the Proposed Transaction;

   ii) whether Defendants have violated Sections 14 and 20 of the Exchange Act in connection with the Proposed Transaction; and

   iii) whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction complained of herein consummated.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

d. Plaintiff's claims are typical of the claims of the other members of the Class and

Plaintiff does not have any interests adverse to the Class.

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class.

f. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

### A. Background

30. Kraft is one of the largest consumer packaged food and beverage companies in North America and worldwide, with net revenues of $18.2 billion and earnings before income taxes of $1.4 billion in 2014. The Company manufactures and markets food and beverage products, including cheese, meats, refreshment beverages, coffee, packaged dinners, refrigerated meals, snack nuts, dressings, and other grocery products, primarily in the United States and Canada, under a host of iconic brands. The Company's product categories span breakfast, lunch, and dinner meal occasions. Kraft is listed on the NASDAQ Stock Market and included in the Standard & Poor's 500 and the NASDAQ - 100 indices.

31. Kraft's diverse brand portfolio consists of many of the most popular food brands in North America, including three brands with annual net revenues exceeding $1 billion each—Kraft cheeses, dinners, and dressings; Oscar Mayer meats; and Philadelphia cream cheese—plus over 25 brands with annual net revenues between $100 million and $1 billion each. In the United States, based on dollar share in 2014, Kraft holds the number one branded market share position

in 11 of the Company's top 17 product categories and the number two branded market share position in the remaining six product categories. The 11 product categories with the number one branded share position contributed more than 50% of the Company's 2014 U.S. retail net revenues while the Company's top 17 product categories contributed more than 80% of Kraft's 2014 U.S. retail net revenues.

32. Kraft was initially organized as a Delaware corporation in 1980. In March 2012, the Company redomesticated to Virginia and changed its name from "Kraft Foods Global, Inc." to "Kraft Foods Group, Inc." On October 1, 2012, Mondelez International, Inc. ("Mondelez International"), formerly known as Kraft Foods Inc., spun-off Kraft Foods Group to Mondelez International's shareholders (the "Spin-Off"). Kraft was a wholly-owned subsidiary of Mondelez International prior to the Spin-Off. To effect the Spin-Off, Mondelez International distributed all of the shares of Kraft Foods Group common stock owned by Mondelez International to its shareholders on October 1, 2012. As a result of the Spin-Off, Kraft began operating as an independent, publicly traded company on October 1, 2012.

**B. <u>The Company is Poised for Growth</u>**

33. Kraft announced its financial results for the second quarter of 2014 in a press release dated July 30, 2014. According to the press release, Organic Net Revenues increased 1.5% from improved volume/mix and pricing benefits of 0.9 percentage points and 0.6 percentage points, respectively. Earnings per share ("EPS") in the second quarter of the previous year were $1.38, which included a $0.62 benefit from market-based impacts to post-employment benefit plans. Excluding this factor, EPS growth reflected an increase in operating income, partially offset by a higher year-over-year tax rate. Kraft then-CEO Tony Vernon assessed the quarter as follows:

> We continue to execute our playbook and are on track to deliver another solid year of growth in earnings and cash flow. However, there's no question that economic and consumer trends are creating top-line growth challenges for the food and beverage industry, Kraft included. Our focus remains on driving profitable growth through brand renovation, innovation, impactful marketing and total cost management.

34. The Company announced its financial results for the third quarter of 2014 in a press release dated October 29, 2014. According to the press release, Organic Net Revenues increased 0.9% as pricing to offset significant rises in commodity costs contributed 2.1 percentage points of growth. Kraft then-CEO Tony Vernon assessed the quarter as follows:

> We remain on track to deliver earnings growth consistent with the expectations we laid out at the start of the year, despite a rapidly changing consumer environment. To date, our implementation of commodity-based pricing has been successful. But in other areas, our execution has been mixed. We will continue to apply our playbook, improve our execution, and proactively adapt to drive profitable growth now and in the future.

35. A press release dated February 12, 2015 announced the Company's financial results for the fourth quarter and full year of 2014. According to the press release, net revenues grew 2.2% and Organic Net Revenues were up 3.4%. Organic growth was driven by positive net pricing of 1.9 percentage points to offset higher input costs, as well as volume/mix gains of 1.5 percentage points from growth in the Refrigerated Meals, Exports and Canada businesses.

36. In light of these factors, the Company is well-positioned to enjoy both short and long-term growth due to its strong position in the packaged food and beverage market.

## C. <u>The Flawed Sale Process</u>

37. On January 20, 2015, Alexandre Behring, the Chairman of the Heinz board and the Managing Partner of 3G Capital, called John Cahill, the Chief Executive Officer of Kraft and the Chairman of the Kraft Board, to arrange a meeting.

38. On January 27, 2015, representatives of Centerview reviewed with members of Kraft senior management Centerview's preliminary perspectives on Kraft's standalone financial plan ("2015 Financial Plan"), which Kraft senior management was in the process of reviewing and updating at Cahill's request following his becoming Chief Executive Officer of Kraft in December 2014, and tactical and strategic alternatives, including a potential business combination with Heinz.

39. On January 28, 2015, Behring and Cahill met in Wheeling, Illinois. During the meeting, Behring indicated Heinz's desire to pursue a business combination of Kraft and Heinz and suggested that the two companies enter into a mutual confidentiality agreement to permit the exchange of non-public information. Cahill indicated to Behring that he would discuss with certain members of the Kraft Board and that, subject to their agreement, he would agree to share certain limited financial information about Kraft that would allow Heinz to analyze potential terms of such a business combination and formulate a proposal. Cahill informed certain members of the Kraft Board and Kraft senior management of his meeting and conversation with Behring. The members of the Kraft Board and Kraft senior management with whom Cahill discussed Heinz's desire to pursue a business combination were supportive of sharing limited financial information about Kraft with Heinz.

40. On January 29, 2015, Kraft and Heinz entered into a mutual confidentiality agreement in order to share certain non-public information about their respective businesses. Among other terms, the confidentiality agreement contained a standstill obligation prohibiting each party and its affiliates and representatives, for a specified period and subject to certain exceptions, from participating in an acquisition of securities of the other party, soliciting any proxies with respect to the voting of any common stock of the other party, or seeking

representation, control or influence over the board of directors of the other party, in each case without the written consent of such other party.

41. Also on January 29, 2015, at the request of Kraft senior management, representatives of Centerview met with Behring in New York. During that meeting, Behring indicated the intention of Heinz and 3G Capital to make a formal proposal for a business combination between Kraft and Heinz. Following the meeting, representatives of Centerview communicated this indication to Kraft senior management.

42. On February 4, 2015, Cahill met with Behring and representatives of each of Centerview and Lazard Frères & Co. LLC ("Lazard") in New York. During the meeting, Behring reviewed with Cahill and the representatives of Centerview 3G Capital's investment track record and operating philosophy.

43. On February 8, 2015, Behring (on behalf of Heinz and 3G Capital), Warren Buffett ("Buffett"), Chairman and CEO of Berkshire Hathaway (on behalf of Berkshire Hathaway) and Jorge Paulo Lemann, Partner and Co-Founder of 3G Capital (on behalf of 3G Capital) provided Centerview with a written proposal addressed to Cahill setting forth a preliminary non-binding indication of interest for a proposed combination of Kraft and Heinz. Such proposal included (i) a $10 billion additional equity investment by 3G Capital and Berkshire Hathaway in Heinz, (ii) a cash payment of $12.50 per share to Kraft's existing shareholders in the form of a special dividend, (iii) a stock-for-stock merger that would result in a 47% ownership interest in the combined entity by the current shareholders of Kraft and a 53% ownership interest by current shareholders and management of Heinz and (iv) certain governance matters, including an 11 member board of directors for the combined company, which would be

comprised of three directors designated by 3G Capital, three directors designated by Berkshire Hathaway and five directors designated by the Kraft Board.

44. On February 9, 2015, there was a meeting of the Kraft Board to discuss the proposal received from Heinz, 3G Capital and Berkshire Hathaway. During the meeting, Cahill informed the Kraft Board that Kraft senior management had approached Centerview, as a potential financial advisor, and Sullivan & Cromwell LLP ("Sullivan & Cromwell") as a potential outside legal advisor, to advise Kraft in connection with a potential transaction with Heinz and the exploration of potential strategic alternatives the Kraft Board may consider in connection with its review thereof. The Kraft Board discussed the proposal from Heinz and other options for Kraft, including the 2015 Financial Plan, and other strategic alternatives. After further discussion, the Kraft Board determined that the preliminary, non-binding merger proposal from Heinz undervalued Kraft, but authorized Cahill to work with Kraft's advisors to further explore a transaction with Heinz and have further discussions with Heinz, 3G Capital and Lazard. The Kraft Board also authorized Cahill to work with Centerview to consider and review the 2015 Financial Plan and to arrange meetings with the CEOs of two other companies, which we refer to as Company A and Company B, to discuss with each the food and beverages industry generally and ways in which Kraft could work together with such other companies to create value for their respective shareholders.

45. During the weeks of February 9 and February 16, 2015, pursuant to the discussion at the February 9, 2015 meeting of the Kraft Board, representatives of Centerview and Kraft senior management further reviewed the 2015 Financial Plan, potential sensitivities to it and the financial impact of various scenarios, consideration around industry consolidation, preliminary analyses of a potential transaction with Heinz and perspectives on potential strategic alternatives.

During this time, Cahill also reached out by phone to the CEOs of Company A and Company B to set up meetings. The meeting with Company A was set for March 4, 2015; the CEO for Company B was unable to meet with Cahill in March and suggested an April meeting date instead.

46. On February 11, 2015, representatives of each of Centerview, 3G Capital and Lazard met to discuss the differences in their respective valuations for Heinz and Kraft.

47. On February 20, 2015, representatives of each of Centerview, 3G Capital and Lazard met to further discuss Heinz's preliminary, non-binding merger proposal. The representatives of 3G Capital offered their perspectives regarding the financial benefits of the proposed combination of Kraft and Heinz and the representatives of Centerview shared with the representatives of 3G Capital and Lazard certain financial projections for Kraft prepared by Kraft senior management.

48. On February 24, 2015, representatives of Lazard met with representatives of Centerview to share additional perspectives on the attractiveness of the proposed transaction to Kraft shareholders. During this meeting, the representatives of Lazard indicated on behalf of 3G Capital a likelihood of increasing either the proposed ownership percentage of Kraft's shareholders in the combined company on a fully diluted basis from 47% to 48% or the special dividend from $12.50 to $15.00. Following the meeting, representatives of Centerview communicated the potential for this revised proposal to members of Kraft senior management.

49. On March 2, 2015, there was a meeting of the Kraft Board which was also attended by certain members of Kraft senior management and representatives of each of Centerview and Sullivan & Cromwell. Cahill and the representatives of Centerview reviewed with the Kraft Board an overview of the process undertaken to date by Kraft in developing

Kraft's strategy going forward and the 2015 Financial Plan, as well as various potential organic and inorganic strategic alternatives that Kraft could consider, including with Company A and Company B. The representatives of Centerview also reviewed with the Kraft Board the possibility of revisions to the Heinz proposal that had been indicated by Lazard during the February 24, 2015, meeting, offering their perspectives on potential levels of cost synergies, ownership split and cash dividend amounts. After discussion, the Kraft Board authorized Kraft senior management and the representatives of Centerview to communicate to 3G Capital that, although the Kraft Board was strategically interested in a potential transaction, 3G Capital's revised indication was not an adequate basis to proceed and directed them to continue their negotiations with Heinz, 3G Capital and their advisors.

50.     On March 4, 2015, Cahill met with the CEO of Company A to discuss the food and beverages industry generally and ways in which the two companies could work together to create value for their respective shareholders. There were no discussions regarding any specific transaction and no specific proposals were made.

51.     Also on March 4, 2015, representatives of Centerview met on behalf of Kraft with representatives of 3G Capital and Lazard and, consistent with the Kraft Board's direction, communicated the Kraft Board's willingness to proceed with the exploration of a transaction providing for 50% ownership of the combined company on a fully diluted basis by Kraft's stockholders and payment of a special cash dividend of $16.00 per share of Kraft common stock to Kraft's shareholders.

52.     On March 6, 2015, Cahill received a call from Behring. During this call, Behring informed Cahill that Heinz would provide a revised offer, with the terms of such offer to be communicated by Lazard to Centerview. Behring made it clear to Cahill that this was Heinz's

best and final offer and that Heinz would not increase the consideration payable to Kraft's shareholders any further. Behring also expressed his views to Cahill that an expeditious process would be in the best interests of both parties and proposed a two week time period to conduct mutual due diligence, negotiate the merger agreement and announce the transaction. Later that day, at the direction of 3G Capital and Heinz, representatives of Lazard communicated to representatives of Centerview a revised offer pursuant to which Kraft shareholders would own 49% of the combined company on a fully diluted basis and receive a pre-closing special cash dividend of $16.50 per share of Kraft common stock and provided Centerview with a non-binding letter from Heinz, 3G Capital and Berkshire Hathaway confirming such proposal to Cahill.

53.     On March 8, 2015, there was a meeting of the Kraft Board which was also attended by certain members of Kraft senior management and representatives of each of Centerview and Sullivan & Cromwell. Cahill provided the Kraft Board with an update on the status of the discussions between Kraft and Heinz since the last Kraft Board meeting on March 2, 2015, including Heinz's "best and final" offer made on March 6, 2015. Cahill informed the Kraft Board that the purpose of the meeting was not for the Kraft Board to make a decision as to whether to enter into a transaction with Heinz, but rather for the Kraft Board to make a decision as to whether it wanted to continue to explore the potential transaction based on the Heinz "best and final" offer, including by proceeding to negotiate with Heinz and to perform detailed mutual due diligence. A representative of Centerview reviewed Centerview's preliminary valuation analyses of the March 6, 2015, proposal and discussed with the Kraft Board certain key governance items that had not yet been negotiated with Heinz. After discussion, the Kraft Board authorized Cahill to continue to work with Kraft's advisors to consider the Heinz proposal based

on the Heinz "best and final" offer, have discussions and negotiations with Heinz, 3G Capital and their advisors, and engage in detailed mutual due diligence with Heinz.

54. Also on March 10, 2015, certain members of Heinz senior management, including Behring, Bernardo Hees, Chief Executive Officer of Heinz, and Paulo Basilio, Chief Financial Officer of Heinz, presented an overview of its business and the strategic rationale, as well as the financial benefits of the proposed transaction, to certain members of Kraft senior management and Kraft's advisors.

55. On March 13, 2015, Kraft senior management presented an overview of its business, including its brand portfolio, cost-saving initiatives since its separation from Mondelez International, Inc. in 2012, growth opportunities, and the 2015 Financial Plan to senior management and representatives of Heinz. Following this meeting, Cahill, Behring and representatives of Centerview and Lazard had a discussion regarding key organizational and governance matters, with both sides outlining positions for the other to consider, including that (i) the combined company would have co-corporate headquarters, one in the Chicago metro area and one in Pittsburgh, (ii) the board of the combined company would be comprised of 11 directors, five of which would be current Kraft directors and six of which would be appointed by 3G Capital and Berkshire Hathaway, and (iii) Hees and Behring would continue in their roles as CEO and Chairman, respectively, of the combined company and that Cahill would be the Vice Chairman of the combined company's board, with additional board responsibilities for Cahill to be further discussed.

56. In addition, on March 13, 2015, representatives of Centerview confirmed in writing to Kraft certain information previously provided orally to the Kraft Board regarding

Centerview's financial advisory and other relationships with the parties to the transaction and other information to allow the Kraft Board to assess Centerview's independence.

57.     On March 15, 2015, representatives of Sullivan & Cromwell received a further revised draft merger agreement from representatives of Cravath, Swain & Moore LLP ("Cravath"), Heinz's outside legal advisor. The March 15, 2015, draft contained certain concessions compared with the initial draft provided on behalf of Heinz on March 9, 2015, including a compromise proposal for a matching rights period of four business days, but also provided for a termination fee of $1.5 billion payable by Kraft upon certain circumstances, which was still higher than Kraft's proposed amount of $1.1 billion, an obligation for Kraft to reimburse an uncapped amount of reasonable and documented out-of-pocket fees and expenses of Heinz if the merger agreement was terminated due to a failure of Kraft to obtain shareholder approval for the proposed transaction, and a "best efforts" obligation of Heinz to obtain the agreed equity investment from 3G Capital and Berkshire Hathaway (but still no unqualified obligation to do so).

58.     Also on March 15, 2015, there was a meeting of the Kraft Board which was also attended by certain members of Kraft senior management and representatives of each of Centerview, Bain & Company ("Bain"), and Sullivan & Cromwell.

59.     On March 16, 2015, representatives of Sullivan & Cromwell and Cravath discussed the key open issues with respect to the merger agreement, including, among other terms, the amount of the termination fee, whether the termination fee should be the sole and exclusive remedy of Heinz if paid, the requested expense reimbursement payable by Kraft if the merger agreement was terminated due to Kraft's failure to obtain shareholder approval for the

proposed transaction, Heinz's obligation to obtain the equity investment from 3G Capital and Berkshire Hathaway and certain issues relating to employee compensation and benefits matters.

60.     Also on March 16, 2015, representatives of each of Kraft, Heinz, Berkshire Hathaway and Lazard met with credit rating agencies in New York City, New York, to discuss the potential credit rating for the combined company.

61.     During the week of March 16, 2015, Kraft engaged outside advisors to conduct employee benefits and pension and change of control related compensation due diligence.

62.     On March 17, 2015, Cahill met Lemann and Marcel Telles, each one of the founding partners of 3G Capital, in Munich (with Behring participating by phone for portions of such meeting) to discuss the business and operating strategy for the combined company.

63.     On March 19, 2015 and March 20, 2015, representatives of Centerview, Lazard, Sullivan & Cromwell and Cravath discussed possible alternatives for a new board committee headed by Cahill. Based on and consistent with these discussions and further discussions they had with Cahill, representatives of Centerview and Sullivan & Cromwell outlined the framework for a new operations and strategy committee of the board of the combined company tasked with oversight of the integration process and the future strategy and ongoing operations of the combined company. This committee would be led by Cahill and include one member each of 3G Capital and Berkshire Hathaway.

64.     On March 20, 2015, representatives of Cravath sent a further revised draft of the merger agreement to Sullivan & Cromwell. In the revised draft merger agreement, Heinz accepted an unqualified obligation to obtain the agreed equity investment, but was still proposing a termination fee of $1.5 billion payable by Kraft upon certain circumstances, which would be in addition to any other remedies available to Heinz, and an obligation for Kraft to reimburse

reasonable and documented out-of-pocket fees and expenses of Heinz if the merger agreement was terminated due to a failure of Kraft to obtain shareholder approval for the proposed transaction (now subject to a cap of $20 million).

65. On March 21, 2015, representatives of each of Sullivan & Cromwell and Cravath had a number of discussions regarding the key remaining issues for the merger agreement, including, among other terms, the amount of the termination fee, whether such termination fee should be the sole and exclusive remedy of Heinz if paid, the expense fee payable if the merger agreement was terminated due to Kraft's failure to obtain shareholder approval for the proposed transaction with Heinz, certain employee compensation and benefits matters and certain governance matters, including the name and location of headquarters of the combined company. During such discussions, the parties tentatively agreed, based on the prior direction provided by their respective clients, among other terms, to a termination fee of $1.2 billion, which would be the sole and exclusive remedy for Heinz if paid, and that if the merger agreement was terminated due to Kraft's failure to obtain shareholder approval, Kraft would be obligated to reimburse Heinz for its reasonable and documented out-of-pocket fees and expenses up to a cap of $15 million.

66. On March 22, 2015, a representative of Lazard communicated to a representative of Centerview that the framework proposed for the operations and strategy committee of the combined board was acceptable to Heinz and 3G Capital.

67. Also on March 22, 2015, there was a meeting of the Kraft Board. The Kraft Board reviewed with the advisors the due diligence conducted to date on Heinz, including business, legal and accounting due diligence, joint sessions on synergy opportunities, and Heinz's due diligence investigation on Kraft. Cahill then reviewed the continuing discussion between Kraft

and Heinz on governance topics and the business and operating strategy of the combined company, including his meeting in Munich with Lemann and Telles on March 17, 2015. He also reviewed with the Kraft Board the 2015 Financial Plan and an upside case to such plan developed by Kraft senior management reflecting various cost management initiatives, which we refer to as the Upside Case of the 2015 Financial Plan (the 2015 Financial Plan and the Upside Case of the 2015 Financial Plan being referred to collectively herein as the Financial Forecasts). Representatives of each of Centerview and Bain reviewed with the Kraft Board a joint overview with each of their perspectives with respect to value creation and synergies expected from the transaction compared with the 2015 Financial Plan and the Upside Case of the 2015 Financial Plan. The representatives of Centerview reviewed with the Kraft Board certain preliminary pro forma financial information for the combined company, including the pro forma per share valuation sensitivities, and Centerview's preliminary valuation analyses. Following this review, the Kraft Board discussed the likelihood of Kraft being able to achieve the Upside Case of the 2015 Financial Plan, particularly with respect to cost savings initiatives, on a standalone basis, and the likelihood that Heinz could achieve the synergies they had identified for the combined company. The representatives of Centerview also reviewed with the Kraft Board the preliminary feedback received from the credit rating agencies. Representatives of Centerview then reviewed with the Kraft Board the proposed governance structure for the combined company and related matters that were being negotiated with Heinz, including having co-corporate headquarters in Pittsburgh and the Chicago metro area, the makeup of the combined company's board (five directors appointed by Kraft and three directors appointed by each of 3G Capital and Berkshire Hathaway), that Hees and Behring would continue in their roles as CEO and Chairman, respectively, of the combined company and that Cahill would be the Vice Chairman of the

combined company's board, which would establish an operations and strategy committee (comprised of Cahill and one member each of 3G Capital and Berkshire Hathaway), and the combined company's name.

68.    On March 23, 2015, Cahill had a discussion with Behring and Buffett in which Buffett expressed to Cahill his views of, and commitment to, the proposed transaction.

69.    Also on March 23, 2015, Kraft and Centerview executed a formal engagement letter.

70.    On March 24, 2015, representatives of Sullivan & Cromwell sent a revised draft merger agreement to Cravath, which was in substantially final form, reflecting discussions among Kraft's and Heinz's respective advisors during the preceding days. The final remaining points on the draft merger agreement, along with the final remaining points on the Ancillary Transaction Documents, were agreed throughout the course of the day.

71.    Also on March 24, 2015, the Kraft senior management reviewed the ongoing due diligence process and provided their perspectives on the Heinz financial information to Centerview.

72.    In the afternoon on March 24, 2015, there was a meeting of the Kraft Board that was also attended by certain members of Kraft senior management and representatives of each of Centerview and Sullivan & Cromwell. Cahill provided the Kraft Board with an update on the status of the proposed transaction since the last Kraft Board meeting on March 22, 2015. Representatives of Centerview then updated the Kraft Board on the resolution of the governance structure of the combined company and the results of due diligence conducted by certain of Kraft's advisers. Representatives of Centerview informed the Kraft Board that their financial analyses with respect to the combined company reflected their discussion with Kraft senior

management of the results of the due diligence conducted by Kraft's advisors. The representatives of Centerview then reviewed with the Kraft Board Centerview's financial analyses of the merger consideration and special dividend per share amount (taken together and not separately) payable to Kraft shareholders pursuant to the Proposed Transaction. A representative of Centerview then delivered to the Kraft Board Centerview's oral opinion, which was confirmed in writing later that day, that as of March 24, 2015 and based upon and subject to the various assumptions made, procedures followed, matters considered, and qualifications and limitations set forth in its written opinion, the Consideration is fair, from a financial point of view, to the holders of shares of Kraft's common stock. The Kraft Board then engaged in discussion regarding the terms of the Merger Agreement and the Proposed Transaction and considered whether they are fair to, and in the best interest of, Kraft and its shareholders. After discussion, the Kraft Board unanimously adopted a resolution concluding that the Merger Agreement and Proposed Transaction are fair to and in the best interests of Kraft and its shareholders, approving and declaring it advisable that Kraft enter into the Merger Agreement and adopting the Merger Agreement and the Proposed Transaction. The Kraft Board also unanimously adopted a resolution recommending that the shareholders of Kraft approve the Merger Agreement and approve and/or adopt such other matters that are submitted for their approval and/or adoption (as the case may be) in connection with the Merger Agreement. The Kraft Board also agreed that John Cahill, L. Kevin Cox, Jeanne Jackson, Mackey McDonald and John Pope would be the five current Kraft directors that should be on the board of directors of the combined company.

73. On March 24, 2015, following the Kraft Board call, Kraft, Heinz, Merger Sub 1, and Merger Sub 2 executed the Merger Agreement.

**D. <u>The Proposed Transaction</u>**

74. On March 25, 2015, Kraft and Heinz issued a press release announcing the Proposed Transaction:

> H.J. Heinz Company and Kraft Foods Group, Inc. (NASDAQ: KRFT) today announced that they have entered into a definitive merger agreement to create The Kraft Heinz Company, forming the third largest food and beverage company in North America with an unparalleled portfolio of iconic brands.
>
> Under the terms of the agreement, which has been unanimously approved by both Heinz and Kraft's Boards of Directors, Kraft shareholders will own a 49% stake in the combined company, and current Heinz shareholders will own 51% on a fully diluted basis. Kraft shareholders will receive stock in the combined company and a special cash dividend of $16.50 per share. The aggregate special dividend payment of approximately $10 billion is being fully funded by an equity contribution by Berkshire Hathaway and 3G Capital.
>
> The proposed merger creates substantial value for Kraft shareholders. The special cash dividend payment represents 27% of Kraft's closing price as of March 24, 2015. Also, by continuing to own shares of the new combined company, Kraft shareholders will have the opportunity to participate in the new company's long-term value creation potential.
>
> **Global Brand Portfolio Powerhouse**
>
> The combination of these iconic food companies joins together two portfolios of beloved brands, including *Heinz, Kraft, Oscar Mayer, Ore-Ida* and *Philadelphia*. Together the new company will have eight $1+ billion brands and five brands between $500 million and $1 billion. The complementary nature of the two brand portfolios presents substantial opportunity for synergies, which will result in increased investments in marketing and innovation.
>
> Alex Behring, Chairman of Heinz and the Managing Partner at 3G Capital, said, "By bringing together these two iconic companies through this transaction, we are creating a strong platform for both U.S. and international growth. Our combined brands and businesses mean increased scale and relevance both in the U.S. and internationally. We have the utmost respect for the Kraft business and its employees, and greatly look forward to working together as we integrate the two companies."
>
> Warren Buffett, Chairman and CEO of Berkshire Hathaway said, "I am delighted to play a part in bringing these two winning companies and their iconic brands together. This is my kind of transaction, uniting two world-class organizations

and delivering shareholder value. I'm excited by the opportunities for what this new combined organization will achieve."

"Together we will have some of the most respected, recognized and storied brands in the global food industry, and together we will create an even brighter future," said John Cahill, Kraft Chairman and Chief Executive Officer. "This combination offers significant cash value to our shareholders and the opportunity to be investors in a company very well positioned for growth, especially outside the United States, as we bring Kraft's iconic brands to international markets. We look forward to uniting with Heinz in what will be an exciting new chapter ahead."

"We are thrilled about the unique opportunities this merger will create for our consumers worldwide, as well as our employees and business partners. Together, Heinz and Kraft will be able to achieve rapid expansion while delivering the quality, brands and products that our consumers love," said Bernardo Hees, Heinz Chief Executive Officer. "Over the past two years, we have transformed Heinz into one of the most efficient and profitable food companies in the world while reinvesting behind our key brands and continuing our relentless commitment to quality and innovation."

**Management and Governance**

When the transaction closes, Alex Behring, Chairman of Heinz and the Managing Partner at 3G Capital, will become the Chairman of The Kraft Heinz Company. John Cahill, Kraft Chairman and Chief Executive Officer, will become Vice Chairman and chair of a newly formed operations and strategy committee of the Board of Directors.

Bernardo Hees, Chief Executive Officer of Heinz, will be appointed Chief Executive Officer of The Kraft Heinz Company. The new executive team for the combined global company will be announced during the transition period, but no later than transaction closing.

The Board of Directors of the combined company will consist of five members appointed by the current Kraft Board, as well as the current Heinz Board, including three members from Berkshire Hathaway and three members from 3G Capital.

**Long-Term Ownership**

3G Capital and its principals have a proven track record of investing in and growing iconic brands. In previous transactions over the years, 3G has partnered with other long-term investors to build significant shareholder value by driving innovation and growth and expanding the international reach of its companies and brands.

Berkshire Hathaway and 3G Capital have a history of successful partnerships and are committed to long-term ownership of The Kraft Heinz Company as it strengthens its leadership position in the industry.

**Commitment to Communities**

The Kraft Heinz Company will be co-headquartered in Pittsburgh and the Chicago area.

Understanding the need to preserve both Heinz and Kraft's heritage in their respective hometowns of Pittsburgh and the Chicago area, the new company is committed to supporting local charities and community relationships in the communities in which they operate.

**Structure, Terms and Synergies**

Existing Heinz shareholders will have a 51% ownership stake in the combined company, and existing Kraft shareholders will have a 49% ownership stake on a fully diluted basis. Each share of Kraft will be converted into one share of The Kraft Heinz Company.

The significant synergy potential includes an estimated $1.5 billion in annual cost savings implemented by the end of 2017. Synergies will come from the increased scale of the new organization, the sharing of best practices and cost reductions.

The transaction is expected to be EPS accretive by 2017. Once the transaction is complete, The Kraft Heinz Company plans to maintain Kraft's current dividend per share, which is expected to increase over time. Kraft has no plans to change its dividend prior to closing.

The special cash dividend of $10 billion in the aggregate to existing Kraft shareholders will be paid upon closing and will be funded by an equity investment by Berkshire Hathaway and 3G Capital. Shares of the company will continue to be publicly traded.

As the cash consideration is fully funded by common equity from Berkshire Hathaway and 3G Capital, the merger is not expected to increase the debt levels of The Kraft Heinz Company. The Company is fully committed to deleveraging in a timely manner and to maintaining an investment grade rating going forward.

**Approvals**

The transaction is subject to approval by Kraft shareholders, receipt of regulatory approvals and other customary closing conditions and is expected to close in the second half of 2015.

**Advisors**

Lazard served as exclusive financial advisor for Heinz, and Cravath, Swaine & Moore and Kirkland and Ellis acted as legal advisors.

Centerview Partners LLC served as exclusive financial advisor for Kraft, and Sullivan & Cromwell acted as legal advisor.

**E. The Unfair Price**

75. Pursuant to the Proposed Transaction, the Company's stockholders will receive $16.50 special dividend as well as stock in the combined company representing a 49% stake in Kraft Heinz. Based on the closing price of Kraft and Heinz shares on March 24, 2015, the last trading day prior to the Proposed Transaction's announcement, the premium to be received by Kraft stockholders pursuant to the Proposed Transaction is only 9%.

76. The consideration is unfair and grossly inadequate because, among other things, the intrinsic value of the Company's common shares is materially in excess of the amount offered in the Proposed Transaction. In short, the Proposed Transaction undervalues Kraft.

77. Kraft shares have recently performed in line with those of the Company's peers. Below is a chart depicting the relative growth of 10,000 shares of Kraft versus 10,000 shares of other packaged food equities purchased in 2012.



Growth of 10,000 KRFT
• KRFT • Packaged Foods • S&P 500 TR USD
18K
16K
14K
12K
10K

| History (02/26/2015) | 2010 | 2011 | 2012 | 2013 | 2014 | YTD |
|---|---|---|---|---|---|---|
| KRFT | – | – | – | 23.07 | 20.22 | 2.23 |
| Packaged Foods | – | – | – | 27.88 | 18.08 | 2.24 |
| S&P 500 TR USD | – | – | – | 32.39 | 13.69 | 2.57 |
| +/- Packaged Foods | – | – | – | -4.81 | 2.14 | -0.00 |
| +/- S&P 500 TR USD | – | – | – | -9.32 | 6.53 | -0.34 |
| Dividend Yield % | – | – | 1.10 | 3.80 | 3.43 | 3.36 |
| Market Cap USD Mil | – | – | – | 32,143 | 36,802 | 37,667 |

78. The press release announcing the Proposed Transaction issued by Kraft on March 25, 2015 notes that the $16.50 cash dividend that will be paid to Kraft stockholders represents a 27% premium relative to Kraft's stock price on March 24, 2015. However, this statistic is deceptive. The overall premium to be received by Kraft stockholders pursuant to the Proposed Transaction is only 9%. A March 25, 2015 *SeekingAlpha.com* article entitled "Kraft And Heinz Merge: Is It Worth It?" contains the following chart created by Citigroup that assesses the value of the Proposed Transaction:

**Figure 1. Kraft/Heinz Deal Math – Initial Take**

*($s in millions)*

| | No Synergies | With Synergies |
|---|---|---|
| KRFT 2014 EBITDA | $ 3,616 | $ 3,616 |
| HNZ 2014 EBITDA | $ 2,840 | $ 2,840 |
| Synergies | | $ 1,500 |
| PF EBITDA | $ 6,456 | $ 7,956 |
| Assumed Multiple | 12.5x | 12.5x |
| KRFT/HNZ Enterprise Value | $ 80,695 | $ 99,446 |
| Less: KRFT Debt | $ (10,032) | $ (10,032) |
| Less: HNZ Debt | $ (13,655) | $ (13,655) |
| Plus: KRFT Cash | $ 1,293 | $ 1,293 |
| Plus: HNZ Cash | $ 2,299 | $ 2,299 |
| KRFT/HNZ Equity Value | $ 60,600 | $ 79,350 |
| KRFT 49% Stake | $ 29,694 | $ 38,881 |
| *Total per share value to KRFT Shareholders* | $ 50.50 | $ 66.12 |
| *Special Dividend to KRFT Shareholders* | $ 16.50 | $ 16.50 |
| Total Consideration to KRFT Shareholders | $ 67.00 | $ 82.62 |
| Kraft's Pre-Deal Stock Price | $61.33 | $61.33 |
| Deal Consideration Premium | 9.2% | 34.7% |
| Pro Forma Leverage | 3.7x | 3.0x |

Source: Citi Research

79. In Kraft, Heinz stands to acquire a company that is financially sound. A March 25, 2015 *SeekingAlpha.com* article entitled "Kraft Is A Great Company for Heinz To Purchase" describes as follows:

> Let's take a look under Kraft's financial hood starting with their balance sheet. Asset structure has been remarkably consistent for the last four years, with total assets fluctuating between $21–$23 billion and the composition of those assets remaining near constant levels. In 2012 the company added $9.9 billion in long-term debt. But, using their highest interest expense and lowest EBITDA readings for the last five years, interest coverage is still a healthy 4.74. The current ratio stands at one. While this would normally create a bit of concern, receivables and inventory levels are firmly under control, indicating the company is very well managed financially. Finally, with a large consumer staples company like Kraft, a tighter balance sheet should be expected.

On a related note, there will be considerable value created as a result of the Proposed Transaction as a result of cost cutting. A March 26, 2015 *SeekingAlpha.com* article entitled "Get Ready For The Kraft Heinz Company" details as follows:

> By taking over Kraft and merging it with Heinz, the new company is hoping to slash costs and boost margins. The press release highlighted an estimated $1.5 billion in annual cost savings. To get there, zero-based budgeting will be used, a system which requires managers to justify spending plans from scratch every year.
>
> When 3G Capital implemented zero-based budgeting at Heinz it led to significant cost cutting, including a 1,480 reduction in the headcount, or ~4%. This has led to a 8% increase in EBITDA margins, from 18% in June 2013 to 26% in 2014. Some analysts believe up to 6% of Kraft's 22,000 employees could be laid off, or ~1,320 jobs.

80. As these indicators make clear, Kraft, if properly exposed to the market for corporate control, would bring a price materially in excess of the amount offered in the Proposed Transaction.

## F. <u>The Preclusive Deal Protection Devices</u>

81. The Proposed Transaction is also unfair because, as part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection

devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

82.     The Merger Agreement contains a "no-shop" provision. Pursuant to Section 5.05(a) of the Merger Agreement, Kraft and its subsidiaries must immediately cease and cause to be terminated any existing discussions or negotiations with any person or its representatives with respect to any acquisition proposal. Specifically, Section 5.05(a) provides that:

> Kraft will not, will cause the Kraft Subsidiaries not to, will cause each Kraft Transaction Representative not to, and will use its reasonable best efforts to cause each External Kraft Transaction Representative not to, and on becoming aware of it will use its best efforts to stop any such Person from continuing to, directly or indirectly, (i) solicit, initiate or knowingly facilitate any inquiries, proposals or offers that constitute, or that would reasonably be expected to lead to, a Takeover Proposal, (ii) engage or otherwise participate in any discussions or negotiations regarding, or furnish to any Person any non-public information in connection with, or for the purpose of facilitating, any inquiries, proposals or offers that constitute, or that would reasonably be expected to lead to, a Takeover Proposal or (iii) execute or enter into any letter of intent, memorandum of understanding, agreement in principle, acquisition agreement, merger agreement, option or other similar agreement (other than an Acceptable Confidentiality Agreement) regarding, or that is intended to result in, or would reasonably be expected to lead to, any Takeover Proposal (an "Acquisition Agreement"). Kraft will, will cause the Kraft Subsidiaries to, will cause each Kraft Transaction Representative to, and will use its reasonable best efforts to cause each External Kraft Transaction Representative, to immediately cease any solicitation, discussions or negotiations with any Persons that may be ongoing with respect to a Takeover Proposal, or any inquiry, proposal or offer that would reasonably be expected to lead to a Takeover Proposal, request the prompt return or destruction of all confidential information previously furnished to any Person in connection with a Takeover Proposal and immediately terminate all physical and electronic dataroom access previously granted to any such Person, its Subsidiaries or its Representatives.

83.     In addition, the Merger Agreement contains a "matching rights" provision that serves as a deterrent to any alternative acquisition proposals. Pursuant to Section 5.05(f) of the Merger Agreement, the Company may not revise or withdraw the Board's recommendation of the Proposed Transaction or terminate the Merger Agreement for a superior proposal without first providing Heinz with advance notice of the same, including a copy of the proposal and the material terms and conditions of such proposal, as well as least four business days to renegotiate

the terms of its own proposal. Further, any amendment to the financial terms or other material

terms of the alternative proposal requires a new notice and a new period of three business days.

Specifically, Section 5.05(f) provides, in relevant part, that:

> Neither the Kraft Board nor any committee thereof will (i) withhold, withdraw or modify in a manner adverse to Heinz the recommendation to shareholders of Kraft that they give the Kraft Shareholder Approval, (ii) recommend or approve the approval of, or publicly propose to recommend or approve the approval of, any Takeover Proposal, (iii) refrain from recommending against any Takeover Proposal that is a tender offer or exchange offer within ten Business Days after the commencement thereof (each such action set forth in clauses (i), (ii) and (iii) being referred to herein as an "Adverse Recommendation Change") or (iv) enter into or propose publicly to execute or enter into (or cause or permit Kraft or any Kraft Subsidiary to execute or enter into or propose publicly to execute or enter into) an Acquisition Agreement (other than any Acceptable Confidentiality Agreement entered into in accordance with this Section 5.05). Notwithstanding anything to the contrary in this Section 5.05, prior to the time the Kraft Shareholder Approval is obtained, but not after, the Kraft Board or any committee thereof may (I) make an Adverse Recommendation Change or (II) cause Kraft to enter into an Acquisition Agreement with respect to a Takeover Proposal, which Takeover Proposal did not result in any material respect from a breach of this Section 5.05 and terminate this Agreement pursuant to Section 8.01(h), in either case if the Kraft Board or any committee thereof determines in good faith, after consultation with its financial advisor and outside counsel, that (A) to do otherwise would be reasonably likely to be inconsistent with its fiduciary duties under applicable Law and (B) in the case of clause (I) where the Adverse Recommendation Change is made in response to a Takeover Proposal or in the case of clause (II), that such Takeover Proposal constitutes a Superior Proposal; provided that the Kraft Board (or any committee thereof) shall not, and shall cause Kraft not to, take any action set forth in clause (I) or clause (II) unless (1) Kraft has provided written notice to Heinz (a "Notice of Adverse Recommendation Change") advising Heinz that the Kraft Board (or such committee) intends to take such action and the reasons therefor, (2) in the case of any Notice of Adverse Recommendation Change provided in connection with a Takeover Proposal, such Notice of Adverse Recommendation Change specifies the material terms and conditions of such Superior Proposal, identifying the Person or Persons making such Superior Proposal and including a copy of the most current version of the agreement or proposal and all material related documentation with respect to such Superior Proposal, (3) a period of at least four Business Days has elapsed following Heinz's receipt of such Notice of Adverse Recommendation Change (it being understood that any amendment or modification (other than an immaterial amendment or modification) to any of the terms of a Takeover Proposal that is the basis for such proposed action shall require a new Notice of Adverse Recommendation Change and an additional

> three calendar day period), (4) if requested by Heinz, Kraft has negotiated, and has caused its Subsidiaries and Kraft Transaction Representatives to negotiate, in good faith with Heinz during such four Business Day period (as extended pursuant to clause (3)) with respect to any changes to the terms of this Agreement proposed by Heinz during such period and (5) taking into account any changes to the terms of this Agreement irrevocably proposed by Heinz, the Kraft Board or any committee thereof has determined in good faith, after consultation with its financial advisor and outside counsel, that the failure to take such action would continue to be reasonably likely to be inconsistent with its fiduciary duties under applicable Law and that, in the case of any Notice of Adverse Recommendation Change provided in connection with a Takeover Proposal, the Takeover Proposal would continue to constitute a Superior Proposal if such changes irrevocably offered by Heinz were to be given effect; and provided, further that any purported termination of this Agreement pursuant to this sentence shall be void and of no force and effect unless the termination is in accordance with Section 8.01(h) and Kraft pays Heinz the Termination Fee in accordance with Section 6.08 prior to or substantially concurrently with such termination.

84. Moreover, the Merger Agreement contains an additional "information rights" provision. Pursuant to Section 5.05(c) of the Merger Agreement, promptly after the receipt by Kraft of any request for information or other inquiry that Kraft reasonably believes could lead to any proposal or other transaction, Kraft must provide Heinz with the material terms and conditions of any such request or inquiry and copies of any written offer, proposal or request, or inquiry. Specifically, Section 5.05(c) provides that:

> Kraft will promptly (but in any event within 24 hours) (i) notify Heinz in writing in the event that Kraft or any of its Subsidiaries or Kraft Transaction Representatives receives a Takeover Proposal and (ii) provide to Heinz (x) an unredacted copy of any such Takeover Proposal made in writing (including any financing commitments or other agreements related thereto) and unredacted copies of all other material written materials constituting or containing terms or conditions with respect to such Takeover Proposal exchanged between Kraft (or any of its Subsidiaries or any Kraft Transaction Representatives) and such Person (or any of its Affiliates or its or their Representatives) or otherwise received by Kraft (or any of its Subsidiaries or any Kraft Transaction Representatives), in each case in connection with such Takeover Proposal (except for redactions of proprietary information of such Person that does not relate to the material terms or conditions of such Takeover Proposal) and (y) a written summary of all material terms and conditions of any such Takeover Proposal to the extent not made in writing (and in each case including the identity of the Person or group making such Takeover Proposal). From and after such notification, Kraft will keep Heinz

> informed on a prompt basis of any material developments with respect to any such Takeover Proposal (including any changes to the material terms or conditions thereof) or any material substantive discussions or negotiations relating thereto. Kraft will not, and will cause the Kraft Subsidiaries not to, enter into any confidentiality or similar agreement with any Person that prohibits Kraft from providing to Heinz any of the information required to be provided to Heinz under this Section 5.05 within the time periods contemplated hereby.

Thus, Heinz can easily match any competing offer because it is granted unfettered access to the offer, in its entirety, and has significant matching rights that eliminate any leverage that the Company has in receiving a competing offer.

85. Section 9 provides that under specified circumstances, including if Kraft terminates the Merger Agreement to approve or recommend a superior proposal, Kraft must pay Heinz a termination fee in connection with the Merger Agreement equal to $1.2 billion if the Proposed Transaction is terminated under certain circumstances.

86. This "termination fee" provision, coupled with the "no-shop" provision, "matching rights" provision, and "information rights" provision, all but ensures that no competing offer will be forthcoming.

87. Ultimately, these preclusive deal protection provisions improperly restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative transaction that constitutes or would reasonably constitute a superior proposal are too narrowly circumscribed.

## G. Insider Benefits

88. Rather than negotiate a transaction that was in the best interests of Kraft's common shareholders, the Company's executive officers and directors are acting to better their own personal interests through the Proposed Transaction

89. The following table, footnotes and discussion describe single and double-trigger benefits for the named executive officers. "Single-trigger" refers to benefits that arise solely from the closing of the Proposed Transaction and "double-trigger" refers to benefits that require two conditions, namely, the closing of the Proposed Transaction and a qualifying termination within two years following such closing. The potential payments in the table below are based on the following assumptions: (1) the relevant price per Kraft common share is $86.88, which is the average closing market price per Kraft common share as quoted on the NASDAQ over the five business days following the first public announcement of the Proposed Transaction, commencing on March 25, 2015; (2) the closing date of the Proposed Transaction is April 1, 2015, which is the assumed date of the closing of the Proposed Transaction solely for purposes of this golden parachute compensation disclosure; and (3) the named executive officers of Kraft are terminated without "cause" or resign for "good reason" (for purposes of this section, each, a "qualifying termination" under the terms of the applicable plan), in either case immediately following the assumed closing of the Proposed Transaction on April 1, 2015.

**Golden Parachute Compensation(1)**

| Name | Cash(2) ($) | Equity(3) ($) | Pension/ NQDC(4) ($) | Perquisites/ Benefits(5) ($) | Other ($)(6) | Total ($) |
|---|---|---|---|---|---|---|
| John T. Cahill | 9,166,667 | 10,604,691 | — | 157,654 | — | 19,929,012 |
| James Kehoe | 2,870,000 | 8,399,311 | — | 98,356 | — | 11,367,667 |
| Chris J. Kempczinski | 2,788,333 | 10,215,528 | 119,000 | 83,992 | — | 13,206,853 |
| Kim K. W. Rucker | 3,071,150 | 6,355,663 | — | 97,852 | — | 9,524,665 |

(1) Two individuals who were named executive officers of Kraft for 2014, W. Anthony Vernon, former Chief Executive Officer, and Teri L. List-Stoll, former Executive Vice President and Chief Financial Officer, no longer served as executive officers of Kraft as of December 27, 2014 and February 28, 2015, respectively, and had entered into a retirement agreement and general release and a separation agreement and general release, respectively, with Kraft prior to the date of the Merger Agreement. In addition, a third named executive officer of Kraft, Sam Rovit, former Executive Vice President and President, Oscar Mayer, was no longer employed by Kraft as of the date of the Merger Agreement. Payments pursuant to Vernon's and List-Stoll's respective separation arrangements in respect of their outstanding performance shares are discussed in footnote 3 below.

(2) The amounts reflect both single and double-trigger payments. Payments in respect of 2015 annual bonuses, which shall be based on individual performance goals deemed met and achievement of corporate performance goals at the greater of target or actual performance achieved through the closing date of the Proposed Transaction, are considered single-trigger payments because they would be made irrespective of a termination of employment. Amounts in respect of 2015 annual bonuses have been pro-rated to reflect an assumed

qualifying termination on April 1, 2015. For purposes of this golden parachute compensation disclosure, cash severance is based on base salary amounts that became effective on April 1, 2015 (Cahill—$1,100,000, Kehoe—$700,000, Kempczinski—$700,000 and Rucker—$771,000), and pro-rata 2015 annual bonus payments are based on assumed performance at target. Estimated double-trigger payments consist of the lump-sum cash severance that would be provided to the named executive officer under the terms of the CIC Plan if the named executive officer were to experience a qualifying termination within two years following the closing of the Proposed Transaction, equal to the product of (A) the named executive officer's applicable separation pay multiple (equal to 3 for Cahill and 2 for all other named executive officers) and (B) the sum of (x) the named executive officer's annual base salary and (y) the named executive officer's target annual incentive award. Receipt of the double-trigger payments is conditioned upon the named executive officer's execution of a general release and compliance with non-competition and non-solicitation obligations, in each case for a period of up to one year following the qualifying termination. Details of the cash payments are shown in the following supplementary table:

| Name | Pro-Rated 2015 Annual Bonus ($) | Severance ($) | Total ($) |
|---|---|---|---|
| Mr. Cahill | 586,667 | 8,580,000 | 9,166,667 |
| Mr. Kehoe | 210,000 | 2,660,000 | 2,870,000 |
| Mr. Kempczinski | 198,333 | 2,590,000 | 2,788,333 |
| Ms. Rucker | 218,450 | 2,852,700 | 3,071,150 |

(3) The amounts reflect both single- and double-trigger payments. Estimated double-trigger payments reflect the unvested portion of stock options granted in 2013, 2014 and 2015, RSUs granted in 2012, 2013, 2014 and 2015 and a pro-rata portion of performance share awards granted in 2013, 2014 and 2015 (as described below), for which vesting would accelerate upon a qualifying termination within two years following the closing of the Proposed Transaction. The amounts above do not include (i) amounts in respect of stock-based awards that are currently vested or that are no longer subject to a substantial risk of forfeiture or (ii) special dividend per share payments (or cash payments in lieu thereof), as such amounts are reflected in the price per share of Kraft common stock assumed for the purposes of this section. With respect to performance shares, under the terms of the Merger Agreement, awards will be paid based on target performance as follows: a single-trigger payment will be made in respect of the portion of the performance cycle lapsed prior to the closing of the Proposed Transaction and an additional payment, which, for the purposes of this section is considered a double-trigger payment, will be made in respect of the remainder of the target amount upon the earlier of the first anniversary of the closing date of the Proposed Transaction (subject to a continued service requirement) or a qualifying termination. In accordance with the terms of their respective retirement and separation agreements, performance shares held by Vernon and List-Stoll were pro-rated based on service through their respective termination dates and will be paid based on target performance, consistent with the Merger Agreement, at closing, in the following amounts: $6,228,080 for Vernon and $551,167 for List-Stoll.

The actual amounts that would be received by the named executive officers in connection with a qualifying termination may be higher or lower than the estimated amounts shown above. The estimated amounts are based on the assumptions detailed above with respect to the price per Kraft common share ($86.88) and the closing date of the Proposed Transaction (April 1, 2015).

Details of the payments that would be received on a qualifying termination in connection with outstanding unvested stock-based awards are shown in the following supplementary table:

| Name | Stock Options ($) | RSUs ($) | Performance Shares ($) (single-trigger payment) | Performance Shares ($) (double-trigger payment) | Total ($) |
|---|---|---|---|---|---|
| Mr. Cahill | 3,368,108 | 1,809,189 | 603,044 | 4,824,350 | 10,604,691 |
| Mr. Kehoe | 4,523,507 | 2,486,245 | 154,395 | 1,235,163 | 8,399,311 |
| Mr. Kempczinski | 3,403,962 | 4,117,504 | 1,103,501 | 1,590,560 | 10,215,528 |
| Ms. Rucker | 1,661,450 | 1,476,612 | 1,447,681 | 1,769,919 | 6,355,663 |

(4) The amounts reflect double-trigger benefits that would be payable upon a qualifying termination within two

years following the closing of the Proposed Transaction and represent accruals attributable to additional age and service credit of 2 years for Kempczinski for all purposes under the applicable pension plan. Receipt of these benefits is conditioned upon the named executive officer's execution of a general release and compliance with restrictive covenants relating to non-competition and non-solicitation, in each case for a period of up to one year following the qualifying termination. Cahill and Kehoe and Rucker are not eligible to participate in any Kraft pension plan.

(5) The amounts reflect double-trigger benefits that would be payable upon a qualifying termination within two years following the closing of the Proposed Transaction and represent continued medical and welfare benefits for the named executive officer and his or her family for 3 years for Cahill and 2 years for the other named executive officers, outplacement services for 2 years and continued perquisites consisting of financial counseling payments for 3 years for Cahill and 2 years for the other named executive officers. None of the named executive officers are eligible for retiree medical benefits. Receipt of these benefits is conditioned upon the named executive officer's execution of a general release and compliance with restrictive covenants relating to non-competition and non-solicitation, in each case for a period of up to one year following the qualifying termination. Details of the payments are shown in the following supplementary table:

| Name | Benefits Continuation ($) | Outplacement ($) | Perquisites Continuation ($) | Total ($) |
|---|---|---|---|---|
| Mr. Cahill | 102,654 | 25,000 | 30,000 | 157,654 |
| Mr. Kehoe | 58,356 | 25,000 | 15,000 | 98,356 |
| Mr. Kempczinski | 43,992 | 25,000 | 15,000 | 83,992 |
| Ms. Rucker | 57,852 | 25,000 | 15,000 | 97,852 |

(6) The named executive officers are also eligible to receive retention awards and certain make-whole payments.

## H. The Materially Incomplete and Misleading Registration Statement

90. On April 10, 2015, Heinz filed the Registration Statement with the SEC in connection with the Proposed Transaction in order to solicit the Company's stockholders' votes in support of the Proposed Transaction. However, the Registration Statement fails to disclose material information to the stockholders of the Company so that the shareholders may make an informed decision regarding the Proposed Transaction.

***Omissions Concerning the Background of the Proposed Transaction***

91. Specifically, the Registration Statement fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Registration Statement fails to disclose the following information:

a. All details relating to the 2015 Financial Plan and the Upside Case of the 2015 Financial Plan;

b. All details relating to the "tactical and strategic alternatives" other than the Proposed Transaction that were reviewed and updated on January 27, 2015 at the request of Cahill;

c. Whether any other entities were considered at the February 4, 2015 meeting in which Behring reviewed with Cahill and representatives of Centerview 3G Capital's investment track record and operating philosophy and, if so, all details relating to the consideration and/or review of the other entities;

d. All details relating to the undervaluation of Kraft by the Heinz offer considered at the February 9, 2015 Kraft board meeting;

e. All details relating to the "differences in their respective valuations for Heinz and Kraft" discussed by Centerview, 3G Capital, and Lazard on February 11, 2015;

f. All details relating to the "perspectives regarding the financial benefits of the proposed combination of Kraft and Heinz" offered by 3G Capital to Centerview and Lazard on February 20, 2015;

g. All details relating to the "various potential organic and inorganic strategic alternatives that Kraft could consider, including with Company A and Company B" at the March 2, 2015, board meeting;

h. All details relating to the "overview of its business and the strategic rationale as well as the financial benefits of the proposed transaction to certain members of Kraft senior management and Kraft's advisors" presented by certain members of Heinz senior management on March 10, 2015;

i. The rationale for and all details relating to the engagement of Bain in connection with the evaluation and negotiation of the Proposed Transaction;

j. All details relating to the meeting with credit ratings agencies on March 16, 2015, to discuss the potential credit rating of the combined company;

k. All details relating to the analysis of the outside advisors hired to conduct employee benefits and pension and change of control-related compensation due diligence along with the rationale for hiring the outside advisor;

l. All details relating to the discussion of the "business and operating strategy for the combined company" that took place on March 17, 2015 between Cahill and two of the founding partners of 3G Capital; and

m. All details relating to the discussion of "possible alternatives for a new board committee headed by Cahill" that took place on March 19, 2015 and March 20, 2015.

***Omissions Concerning Management Projections***

92. The Registration Statement also fails to disclose key information regarding certain projections prepared by Kraft management and provided to, and relied upon, by Centerview, Kraft's financial advisor. Specifically, the Registration Statement fails to disclose:

a. The detailed "Financial Forecasts" prepared by Kraft management and provided to the Kraft Board, Centerview Partners and Heinz as well as the key assumptions underlying the Financial Forecasts (also referred to as the "Certain Kraft Forecasts"), including specific estimates and assumptions made with respect to, revenue and cost growth, capital investment levels, industry performance, general business, economic, market and financial conditions and other future events, as well as matters specific to Kraft's business;

b. The detailed "Heinz Internal Data" prepared by Heinz's management and

provided to Centerview Partners as well as the key assumptions underlying the Heinz Internal Data, including specific estimates and assumptions made with respect to, revenue and cost growth, capital investment levels, industry performance, general business, economic, market and financial conditions and other future events, as well as matters specific to Kraft's business;

c. The detailed projection of "certain cost savings and operating synergies projected by the management of Heinz to result from the Transaction" and key assumptions; and

d. Information related to discussions between Centerview and the senior managements of Kraft and Heinz regarding "their assessment of Kraft Internal Data, the Heinz Internal Data, the Heinz financial information and the Synergies, as appropriate, and the strategic rationale for the Transaction."

***Omissions Concerning Centerview's Financial Analysis of Kraft and Heinz***

93. The Registration Statement also fails to disclose the underlying methodologies, key inputs, and multiples relied upon and observed by Centerview in evaluating Kraft and Heinz for the Proposed Transaction. Specifically, the Registration Statement fails to disclose:

a. In connection with the *Relative Valuation Analysis, Selected Trading Multiples Analysis-Kraft*, (i) the objective selection criteria and metrics; (ii) the specific methodologies employed by FactSet and I/B/E/S in developing their historical and estimated financial data; (iii) the observed company-by-company financial values, multiples and ratios; (iv) the methodologies for determining the Enterprise Value (EV), EBITDA for the 2015 calendar, Enterprise Value/EBITDA, and the ratio of

closing stock price on March 23, 2015, to 2015 calendar year estimated earnings per share (P/E); (v) the rationale for selecting the reference ranges of multiples of EV to 2015 calendar year estimated EBITDA of 12.5x to 13.0x and ratios of closing stock price on March 23, 2015 to 2015 calendar year estimated EPS of 20.0x to 21.0x; and (vi) the specific methodology that Centerview used to translate the EV/EBITDA reference range multiple into the implied equity value range of $60.75 to $63.75 per share of Kraft common stock and the P/E reference range multiple into the implied equity value range of $62.50 to $65.50 per share of Kraft common stock;

b. In connection with the *Relative Valuation Analysis, Selected Transaction Multiples Analysis-Kraft*, (i) the objective selection criteria and metrics; (ii) the observed company-by-company financial values, multiples and ratios; (iii) the specific methodologies employed by the Wall Street research analysts, S&P Capital IQ and Thompson One in developing their historical and estimated financial data; (iv) the specific methodology and inputs for determining the EV and EBITDA; (v) the methodology that Centerview used to determine the reference range of multiples of EV to 2015 calendar year estimated EBITDA of 13.0x to 15.0x; and (v) the rationale for translating the EV/EBITDA reference range into the implied equity value range of $63.75 to $75.50 per share of Kraft common stock;

c. In connection with the *Relative Valuation Analysis, Discounted Cash Flow Analysis-Kraft*, (i) the unlevered cash flows for calendar years 2015 through 2019 for the 2015 Financial Plan and for the Upside Case of the 2015 Financial Plan;

(ii) the methodology for determining the 6.75%–7.25% discount rates applied to the unlevered cash flows and terminal value; (iii) the specific methodology for determining the terminal value; (iv) the rationale for the 2.5% perpetuity growth rate in determining the terminal value; (v) the target capital structure that was used in determining the discount rates applied to the unlevered cash flows and terminal value; and (vi) the specific methodology that Centerview used to translate present values into the implied value range of $69.00 to $78.75 per share of Kraft common stock for the 2015 Financial Plan case and $73.50 to $83.75 per share of Kraft common stock for the Upside Case of the 2015 Financial Plan;

d. In connection with the *Relative Valuation Analysis, Selected Trading Multiples Analysis-Heinz*, the specific methodology that Centerview used to translate the EV/EBITDA and P/E reference range multiples (mentioned in *Relative Valuation Analysis, Selected Trading Multiples Analysis-Kraft*) into the implied equity value range of $30.7 to $38.0 billion for Heinz common stock;

e. In connection with the *Relative Valuation Analysis, Selected Transaction Multiples Analysis-Heinz*, the specific methodology that Centerview used to translate the EV/EBITDA reference range multiples (mentioned in *Relative Valuation Analysis, Selected Transaction Multiples Analysis-Kraft*) into the implied equity value range of $30.7 to $36.7 billion for Heinz common stock;

f. In connection with the *Relative Valuation Analysis, Discounted Cash Flow Analysis-Heinz*, (i) the unlevered cash flows for calendar years 2015 through 2019 for the 2015 Financial Plan and for the Upside Case of the 2015 Financial Plan; (ii) the methodology for determining the 6.75%–7.25% discount rates applied to

the unlevered cash flows and terminal value; (iii) the specific methodology for determining the terminal value; (iv) the rationale for the 2.5% perpetuity growth rate in determining the terminal value; (v) the target capital structure that was used in determining the discount rates applied to the unlevered cash flows and terminal value; and (vi) the specific methodology that Centerview used to translate present values into the implied value range of $38.3 to $44.0 billion for Kraft common stock;

g. In connection with the *Relative Value Analysis*, (i) the specific methodologies and calculations used in determining the Range of Implied Ownership of the Combined Company by Former Kraft Shareholders and the Range of Implied Exchange Rations for the Trading Multiples Analysis, Transaction Multiples Analysis, and Discounted Cash Flow Analysis cases; (ii) the specific impact of the "net cost Synergies" in determining the above values; and (iii) Centerview's specific conclusion with respect to this analysis;

h. In connection with the *Additional Factors – Historical Stock Trading Analysis*, (i) the sources of the historic trading values, (ii) the specific methodology for determining the closing prices for Kraft shares, e.g. daily or weekly closing prices; and (iii) the individual closing price values used in the analysis;

i. In connection with the *Additional Factors – Analyst Price Targets*, (i) the names of the "Wall Street research analysts" publishing the price targets used by Centerview; (ii) the specific Kraft price targets for each research analyst and FactSet; and (iii) the methodologies employed by each research analyst and FactSet in determining the price target;

j. In connection with the *Additional Factors – Present Value of the Transaction*, (i) the specific valuation methodologies employed; and (ii) the rationale for selecting an implied equity value range of $32.8 to $43.3 billion or $71.25 to $88.50 per share of Kraft common stock; and

k. In connection with the *Additional Factors – Contribution Analysis*, (i) the specific contribution analysis methodologies employed; and (ii) the rationale for selecting an implied relative Kraft contribution range of 54.0% to 58.9% excluding synergies and 50.9% to 54.9% including synergies.

***Omissions Concerning Potential Advisor Conflicts***

94. The Registration Statement fails to disclose information that would permit Kraft's stockholders to evaluate the objectivity of the advisors that supported the Proposed Transaction. Specifically, the Registration Statement fails to disclose:

a. All details relating to the relationship between Centerview and Centerview Capital, L.P. ("Centerview Capital") and between Centerview Capital and 3G Capital in light of the fact that "Certain entities affiliated with 3G Capital are limited partners in Centerview Capital."

**FIRST CAUSE OF ACTION**
**(Brought as a Class Against the Individual Defendants and Kraft for Violation of Sections 14(a))**

95. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

96. The Individual Defendants and Kraft have caused the Registration Statement to be issued with material omissions and misleading statements.

97. The Registration Statement is an essential link in the accomplishment of the Proposed Transaction.

98. In the exercise of reasonable care, the Individual Defendants and Kraft should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render it non-misleading.

99. The misrepresentations and omissions in the Registration Statement are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their right to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the vote by shareholders.

**SECOND CAUSE OF ACTION**
**(Brought as a Class Against the Individual Defendants for Violation of Section 20(a))**

100. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

101. The Individual Defendants acted as controlling persons of Kraft within the meaning of § 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Kraft and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

102. Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

103. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have

had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were all involved in negotiating, reviewing, and approving the Proposed Transaction. The Registration Statement purports to describe the various issues and information that they reviewed and considered, descriptions which must have had input from the Individual Defendants. The Registration Statement at issue contains the recommendation of all the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in the making of these documents.

104. By virtue of the foregoing, the Individual Defendants have violated § 20(a) of the 1934 Act.

105. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated § 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Individual Defendants are liable pursuant to § 20(a) of the 1934 Act. As a direct and proximate result of the Individual Defendants' conduct, Kraft and its shareholders will be irreparably harmed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands relief in his favor and in favor of the Class and against Defendants as follows:

A. Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative, and certifying his counsel as class counsel;

B. Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with the Defendants from consummating the Proposed Transaction, unless and until the

Company discloses all material information to stockholders in connection with the Proposed Transaction;

C.      Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff rescissory damages;

D.      Directing Defendants to account to Plaintiff for all damages suffered as a result of the wrongdoing;

E.      Declaring that the Registration Statement is materially misleading and contains omissions of material fact in violation of Section 14 of the Exchange Act and Rule 14 promulgated thereunder;

F.      Awarding compensatory damages in favor of Plaintiff against Defendants for all losses and damages suffered as a result of Defendants' wrongdoing alleged herein, together with interest thereon;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: April 27, 2015

Respectfully submitted,

**FINKELSTEIN THOMPSON LLP**

Robert O. Wilson

Robert O. Wilson (VSB 77791)
L. Kendall Satterfield
Rosalee B.C. Thomas
1077 30th Street NW, Suite 150
Washington, DC 20007
Telephone: (202) 337-1050
Facsimile: (202) 337-8090
rwilson@finkelsteinthompson.com
ksatterfield@finkelsteinthompson.com
rbcthomas@finkelsteinthompson.com

Of Counsel:
**BROWER PIVEN**
**A Professional Corporation**
Brian C. Kerr
475 Park Avenue South, 33rd Floor
New York, NY 10016
Telephone: (212) 501-9000
Facsimile: (212) 501-0300
kerr@browerpiven.com